# EXHIBIT 1

PROPOSED FIRST AMENDED COMPLAINT

# EXHIBIT 1

JAMES P. KEMP, ESQUIRE
Nevada Bar No. 006375
KEMP & KEMP, ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110,
Las Vegas, NV  89130
(702) 258-1183/(702) 258-6983 (fax)
jp@kemp-attorneys.com
Attorney for Plaintiff Julie Hanna

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * *

JULIE HANNA,

                Plaintiff,

vs.

K-KEL, INC.. a Nevada Corporation; MARK
BROADHURST, an individual; MIKE YORK,
an individual; CHASE SWANSON;  DOES I-
X; and ROE Business Entities I-X,

                Defendants.

Case No.:  2:21-cv-00639-JCM-BNW

**FIRST AMENDED COMPLAINT**

COMES NOW THE PLAINTIFF, by and through her counsel, JAMES P. KEMP, ESQ., of KEMP & KEMP, ATTORNEYS AT LAW, and states and alleges causes of action against the Defendant(s) as follows:

**JURISDICTION**

1.     In filing this civil action, Plaintiff Julie Hanna seeks damages and injunctive relief under federal and state anti-discrimination statutes.

2.     This Court has subject matter jurisdiction over this action under state and federal law.

3.     Defendant K-KEL, Inc., the major named Defendant in this action, along with the fictitious defendants detailed below, owns and operates the club "Spearmint Rhino," located at 3340 South Highland Drive, Las Vegas, Nevada, in Clark County, Nevada.

4.      Defendant K-KEL, Inc. engages in activities that affect interstate commerce and they employ more than 15 employees in the timeframes required to be subjected to both the Nevada statutes and federal statutes prohibiting discrimination.

5.      Defendants Mark Broadhurst, Mike York, and Chase Swanson were employees of Spearmint Rhino located 3340 South Highland Drive, Las Vegas, Nevada, in Clark County, Nevada.

6.      Venue is therefore proper in this court because all events or omissions giving rise to Ms. Hanna's claims occurred in Clark County, Nevada.

## INTRODUCTION

Plaintiff Julie Hanna (hereinafter "Ms. Hanna") by and through her undersigned attorneys, files this Complaint for declaratory, injunctive, and monetary relief against the Defendants (herein referred to collectively as "Defendants") to seek redress for violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 *et seq.*; Title VII of the Civil Rights Act, 42 U.S.C. §§2000e, *et seq.,* as amended  ("Title VII"); and  Nev. Rev. Stat. Ann. § 613.330 *et seq.* Beginning in approximately 2006, after several years of working in retail while searching for gainful employment in Las Vegas, Ms. Hanna began working at Spearmint Rhino (hereafter "SR" or the "Club") as a cocktail server. When she was hired, she was thrilled to obtain a more stable position that would enable her to make progress toward her financial goals, including preparing for her eventual retirement. Unfortunately, shortly after beginning her tenure at Spearmint Rhino, Ms. Hanna's supervisors began to subject her to egregious sexual harassment and assault. Between approximately 2008 and her departure from Spearmint Rhino on or about February 22, 2016, supervisors Mark Broadhurst, Mike York, Mark Allheims, and Chase Swanson made inappropriate sexual advances toward Ms. Hanna, repeatedly physically and verbally harassed her. For example, Mark Broadhurst, a supervisor at SR, slapped Ms. Hanna's buttocks as he walked past her several times each night, and soon escalated his advances by grabbing Ms. Hanna's breasts, pushing his body against hers, and approaching her from behind while she cleaned a table to

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

simulate rape. He and others at the Club, including Mike York, asked Ms. Hanna to perform oral sex. Indeed, upon meeting Ms. Hanna, Mr. York, another Club manager, began to ask Ms. Hanna if she liked to perform oral sex, asked her to come to his office, and when she declined, warned her that he was her supervisor and threatened to terminate her employment. Ultimately, Mr. York forced Ms. Hanna to perform oral sex in his office approximately ten or eleven times, during which Ms. Hanna felt paralyzed, numb, and was terrified of losing her job. In approximately the summer of 2012, Mike York raped Ms. Hanna in her own home. During the rape, Mr. York, who was much heavier than Ms. Hanna and approximately 8 inches taller, forcefully pushed her onto her bed, where he pulled her pants and underwear down to her ankles and penetrated her, then ejaculated on her stomach. Mr. York then stood up, and after several minutes in the bathroom, left Ms. Hanna's apartment without a word. Unsurprisingly, Ms. Hanna has suffered severe emotional and financial harm, as well as other harm, as a direct result of the illegal actions of SR, through the acts of its supervisors.

### PARTIES

7.      Plaintiff Julie Hanna, whose legal name was Julie Danou during the relevant time period at issue in this complaint, was a Cocktail Waitress from approximately 2006 until February 2016.

8.      At all times relevant to this Complaint, Ms. Hanna was an employee within the meaning of the ADEA, 29 U.S.C. § 630(f); Title VII, 42 U.S.C. § 2000e(f); and is a person protected by Nev. Rev. Stat. Ann. § 613.330(1)(a).

9.      Named Defendant, K-KEL, Inc. is a foreign corporation or business entity, or a Nevada corporation or business entity which, along with others, owns and operates Spearmint Rhino Gentlemen's Club in Las Vegas, Nevada.

10.     Defendant K-KEL, Inc., doing business as Spearmint Rhino, employed Ms. Hanna as a cocktail server.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

11.     Defendant K-KEL, Inc. has been named in this lawsuit because, upon information and belief, it is the name of the business entity where Ms. Hanna was employed during the times relevant to this lawsuit. Additionally, from time to time, K-KEL, Inc. was the employer/respondent identified and listed by the Equal Employment Opportunity Commission or the Nevada Equal Rights Commission in the Charge, which those agencies drafted for Ms. Hanna.

12.     Ms. Hanna is not familiar or knowledgeable of the complexities and changes in the business entities or corporations that owned and/or operated Spearmint Rhino between 2006 and the present date.

13.     Therefore, Ms. Hanna is asserting all of her claims, if need be, against Defendants collectively and is alleging fictitious defendants herein as placeholder names for the proper business entities.

14.     Doe Defendants I-X are natural persons who own, operate and/or control the named Defendant business entity. Similarly, the Roe Business Entities I-X are being sued as well for directing, assisting or ratifying the wrongful actions pled herein as the actions of Ms. Hanna's employer. Thus, Roe Business Entities I-X are entities, including without limitation, predecessor, successor, parent or subsidiary corporations, or other kinds of business entities or organizations, which are owned, operated, were related to, connected to, controlled or operated Spearmint Rhino, where and when Ms. Hanna was employed and was subjected to the discrimination and harassment pled below. Upon discovery of the true identities of any parties Plaintiff will seek to amend this Complaint to name them in this action.

15.     These fictitious Defendants are persons, entities or organizations who engaged in, oversaw, directed or assisted in the wrongful, discriminatory actions against Ms. Hanna, along with the named Defendant, or who may be individual owners, officers, agents or employees of the named Defendant business entity or the Roe Defendants, or corporate overseers who thereafter tolerated or ratified the unlawful conduct, or otherwise benefitted or profited from it. Roe and Doe Defendants may be agents,

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

servants, employees, employers, venturers, and/or partners of the named Defendants and the Doe and Roe Defendants, and/or each other.

16.     The real names of these fictitious defendants are unknown to Ms. Hanna at this time.  However, Ms. Hanna will seek leave to amend this Complaint and substitute the true names of the Roe and Doe Defendants as soon as their identities are revealed.

17.     Defendant K-Kel, Inc. is and was at all times relevant to this Complaint an employer within the meaning of ADEA, 29 U.S.C. § 630(f), Title VII, 42 U.S.C. § 2000e(f); and Nev. Rev. Stat. Ann. § 613.310(2).

18.     Defendants Mark Broadhurst, Mike York, and Chase Swanson were employees of Spearmint Rhino located 3340 South Highland Drive, Las Vegas, Nevada, in Clark County, Nevada.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.     Ms. Hanna exhausted all administrative remedies as required before filing this action.

20.     At all times relevant to these matters, there existed work-sharing agreements between the Nevada Equal Rights Commission (hereinafter "NERC") and the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC"), and state and federal law, which allowed that filing with one administrative agency constitutes filing with the other for purposes of ultimately filing suit.

21.     In February 2016, Plaintiff Julie Hanna initiated administrative proceedings with the Nevada Equal Rights Commission ("NERC") for unlawful discrimination by K-KEL, Inc., doing business as Spearmint Rhino, located at 3340 South Highland Drive, Las Vegas, Nevada 89109. On April 19, 2016, Ms. Hanna signed her formal "Charge of Discrimination."

22.     On October 5, 2018, the NERC issued a "Determination" that there existed probable cause that K-KEL, Inc., Ms. Hanna's employer, subjected her to sex discrimination, and thereafter invited the parties to engage in the NERC's conciliation process.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

23.     Later in October 2018, the parties engaged in conciliation, which did not result in a settlement. The NERC transferred the matter to the EEOC on October 23, 2018, and the EEOC asserted its jurisdiction over the matter pursuant to the aforementioned work-sharing agreement.

24.     Thereafter, on December 12, 2018, the EEOC issued a "Notice of Right to Sue" letter authorizing the filing of a civil action.

25.     On February 13, 2019, Ms. Hanna and Defendant K-KEL, Inc. entered into a Tolling Agreement which tolled the deadline for filing her complaint such that "any complaint filed by [her] against Spearmint Rhino in court or any arbitration will be deemed filed as of the Effective Date [of the Tolling Agreement] for purposes of any defenses relating to time, including laches."

26.     The parties thereafter retained a private mediator to explore a resolution of this matter, but were unable to resolve it.

27.     The Tolling Agreement required that Ms. Hanna notify Defendant thirty (30) days prior to filing the instant lawsuit, which she did on [date].

28.     Therefore, all conditions precedent to the filing of this lawsuit have been performed or have occurred as required by Title VII, 42 U.S.C. §2000e-5.13; the ADEA, 29 U.S.C. §§626(d)and (e); and Nev. Rev. Stat. Ann. § 613.420

29.     All conditions precedent to the filing of this lawsuit have been performed or have occurred as required by state and federal law.

30.     All conditions precedent to the filing of this lawsuit have been performed or have occurred as required by Nevada Revised Statutes; and this action is timely filed within 90 days of receipt of the notice provided by the Nevada Equal Rights Commission (hereafter NERC) and/or the EEOC.

31.     Acts complained of herein were malicious, oppressive, willful and intentional.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

**FACTS**

32.    In approximately 2006, Ms. Hanna began working full-time as a cocktail server at Spearmint Rhino.

33.    Between approximately 2006 and her departure from SR on or about February 22, 2016, Ms. Hanna typically worked 4 to 5 days per week, from Thursday through Monday. Her work schedule varied slightly, although Ms. Hanna mostly worked the morning shift, which began at 4:00 am or 5:00 am and ended at approximately 11:30 am or 1:00 pm, respectively.

34.    At times, if the Club was less busy, supervisors permitted Ms. Hanna or other servers to depart work early.

35.    During her employment with SR, Ms. Hanna's duties as a cocktail server consisted of serving food and drinks to customers in various areas of the club, including on the main floor, as well as in the VIP and Champagne rooms, where she served customers in a more private setting, typically along with one other female cocktail server.

36.    During each shift, Ms. Hanna was supervised by a female cocktail supervisor who oversaw the work of all cocktail servers in the club.

37.    In addition, each shift had typically two male managers who oversaw the work of all wait staff working at the club during the shift, including the cocktail servers and bartenders. During her employment with Spearmint Rhino, Ms. Hanna's male supervisors included Mark Broadhurst, Mike York, Mark Allheims and Chase Swanson [Cl never knew his last name- confirm], as well as others. On a few occasions, club co-owner K-KEL also oversaw employees working at the club. Co-owner Kevin Kelly was seldom in the club during Ms. Hanna's shifts.

**Sexual Harassment and Assault by Mark Broadhurst**

38.    Between 2008 and 2016, Mark Broadhurst, a supervisor at SR, frequently worked the morning shift and oversaw Ms. Hanna's work.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

39.     Although Mr. Broadhurst sometimes conveyed information to Ms. Hanna through the cocktail supervisor, he often provided direct instruction to Ms. Hanna, asking her to serve specific tables, alerting her when an employee or another coworker needed to speak with her, and monitoring her activities throughout her shift.

40.     Early in her tenure with SR, Mr. Broadhurst began to slap Ms. Hanna's buttocks when he walked past her. This occurred on a nearly-nightly basis, several times per night, including in front of other colleagues and security personnel at the club.

41.     Over the course of approximately one year, Mr. Broadhurst's advances escalated. He then began to approach Ms. Hanna in the VIP room or the Champagne room, private rooms where Ms. Hanna was sometimes assigned to serve customers. Mr. Broadhurst often approached Ms. Hanna when these rooms did not have customers, and asked her to show him her breasts.

42.     When the VIP and Champagne rooms were less busy, Mr. Broadhurst would allow the second female cocktail server to depart early from her shift, leaving Ms. Hanna alone in the room with him. On these occasions, Mr. Broadhurst approached Ms. Hanna and sometimes grabbed her breasts, pushed his body against hers, slapped her buttocks, and rubbed her buttocks with his hands.

43.     Upon information and belief, an employee saw Mark Broadhurst regularly walk up to Ms. Hanna in order to brush up against her and grab her breasts and/or rub her buttocks.

44.     Mr. Broadhurst often communicated his advances toward Ms. Hanna in an aggressively physical manner. He touched her lower back and ran his fingers along her back and along her buttock in a sexually suggestive manner. Ms. Hanna backed away and walked away quickly.

45.     One day, Mr. Broadhurst approached Ms. Hanna while she was bending down to clean a table in the VIP room. As Ms. Hanna leaned forward to clean a table, Mr. Broadhurst approached her from behind and began to thrust his hips between Ms. Hanna's legs, slamming his clothed genitals into her buttocks and pretending to penetrate her, simulating rape. This went on for approximately 60 seconds.

46.     Ms. Hanna could not see Mr. Broadhurst's face because he was behind her, but she recalls hearing him asking "does that feel good" and "do you like that," or words to that effect. It was clear to Ms. Hanna, due to the concerted fashion in which Mr. Broadhurst approached her, that he had thought about the attack beforehand, waiting until customers had left the room and Ms. Hanna was alone.

47.     After this first attack, Mr. Broadhurst continued to approach Ms. Hanna and assault her from behind on a more regular basis, whenever no one was around.

48.     On another occasion when the club was slow, Mr. Broadhurst approached Ms. Hanna as she stood near the doorway of the VIP room waiting for customers to arrive. As Ms. Hanna walked into the VIP room to avoid encountering Mr. Broadhurst, he followed her inside. He unzipped his pants and asked Ms. Hanna to touch his penis. Ms. Hanna refused. During the entire event, Mr. Broadhurst appeared to be smirking. He then asked Ms. Hanna to give him a "blow job." When Ms. Hanna again refused, shook her head, and told him she had to get back to work to serve a customer, Mr. Broadhurst appeared angry or annoyed. He looked at Ms. Hanna, glared into her eyes for a moment, and began to walk away.

49.     Shortly thereafter, Mr. Broadhurst approached her in the Half Hour room one morning after a second cocktail server working in the room had finished working. Mr. Broadhurst approached Ms. Hanna, who was standing near the bar, and instructed her to walk toward the back of the room where there were curtains and the room was darker.

50.     Mr. Broadhurst suddenly grabbed Ms. Hanna's hand and pulled her toward him. He looked at her, unzipped his pants, pulled out his penis, and forced Ms. Hanna's hands to touch his penis. Mr. Broadhurst told Ms. Hanna that the "camera guy is on a break," or words to that effect, suggesting that they were not being observed by anyone.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

51.     As the floor supervisor, Mr. Broadhurst was privy to when security personnel were taking a break, and would use those opportunities to make advances on Ms. Hanna and force her to perform sexual acts.

52.     Toward the end of her employment, Mr. Broadhurst touched Ms. Hanna's buttocks and grabbed her breasts between ten and fifteen times per shift, on nearly every shift.

53.     Upon information and belief, a witness estimated that he saw Mr. Broadhurst touch Ms. Hanna in that manner on many dozens of occasions.

54.     Between 2012 and 2016, Mr. Broadhurst also forcefully kissed Ms. Hanna several times. For example, one day, as Ms. Hanna was standing in the VIP room, Mr. Broadhurst approached her suddenly, slammed his body into hers, and forced his lips onto hers. Ms. Hanna's arms were down to her side, and she immediately turned her head away. At times, Mr. Broadhurst attempted to kiss Ms. Hanna's lips, but she turned her head in time and he kissed her cheek or her nose.

55.     At every turn, Ms. Hanna refused Mr. Broadhurst's advances and made the unwelcomeness of his conduct known to him by verbally telling him "no" and words to that effect, and walking away from him as he approached her.

### Sexual Harassment, Assault, and Rape by Mike York

56.     Mike York, a club manager, began working at Spearmint Rhino before the club hired Ms. Hanna.

57.     Mr. York supervised many employees, including Mr. Broadhurst.

58.     Approximately three (3) years into Ms. Hanna's employment with SR, Mr. York began working the morning shift during the weekends, and therefore overlapped with Ms. Hanna several days per week.

59.     Immediately upon meeting her, Mr. York approached Ms. Hanna on the main club floor and began to ask her personal questions.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

60.     Ms. Hanna noticed Mr. York observing her from across the room, and felt his eyes following her as she served customers, placed orders at the bar, and spoke to colleagues.

61.     Ms. Hanna felt very uncomfortable, and attempted to avoid Mr. York during her shift.

62.     However, Mr. York's behavior quickly intensified, and mere weeks after he met Ms. Hanna, he began to ask her if she "like[d] to suck dick" and "give [him] blowjobs," and words to that effect.

63.     He also asked Ms. Hanna about her sexual preferences. Ms. Hanna did not answer and walked away. Mr. York then stated to Ms. Hanna that he was her manager and she should not walk away from him. On several occasions, he stated "stop walking away from me, you know I could fire you," or words to that effect.

64.     On another occasion, Mr. York asked Ms. Hanna to "sit on it," referring to his penis.

65.     As time elapsed, Mr. York became even more brazen in his assaults of Ms. Hanna, and began to invite Ms. Hanna to his office, stating that "there are no cameras there."

66.     Although Mr. York shared an office with another manager, he repeatedly found opportunities to instruct Ms. Hanna to go to his office at the end of her shift.

67.     On one occasion, he told Ms. Hanna that he would be "counting drawers" while he waited for her in his office. Too afraid to decline, Ms. Hanna walked away without a word, ended her shift, and left without complying with Mr. York's request.

68.     This happened several times, with Mr. York asking Ms. Hanna to come to his office, and Ms. Hanna departing before he could find her. On these days, Ms. Hanna would run into the dressing room at the end of her shifts, quickly throw on her clothing, and rush out of the club to avoid running into Mr. York.

69.     Eventually, Mr. York realized Ms. Hanna was avoiding him and began to ask a cocktail supervisor, host, or bouncer to instruct Ms. Hanna to go to his office at the end of her shift.

70.     One morning in March or April 2012, during Ms. Hanna's shift, the cocktail supervisor told Ms. Hanna that Mr. York had demanded that Ms. Hanna not leave at the end of her shift, requiring that she instead go to his office. At the end of her shift, as Ms. Hanna was walking toward the exit, Mr. York stopped her, stating angrily words to the effect that he had "told [her] not to leave."

71.     Ms. Hanna resisted, and Mr. York paused, looked at Ms. Hanna, and threatened her, stating words to the effect that "if you don't do what I say, I can fire you."

72.     Afraid of losing her job, Ms. Hanna followed Mr. York to his office, where he sat down on his chair behind his desk and motioned for Ms. Hanna to sit in one of the two chairs on the other side of the desk. Ms. Hanna sat down and waited for Mr. York to speak.

73.     Instead, Mr. York looked around to ensure no one was nearby and asked Ms. Hanna to walk around to the other side of the desk to "suck his dick."

74.     Ms. Hanna stood from her chair and walked around to the other side of the desk where Mr. York sat. Mr. York instructed her to "get on [her] knees," or words to that effect, which Ms. Hanna did.

75.     Mr. York unzipped his pants and slid his buttock toward the edge of the chair. He pulled his penis out of his pants and, holding it with one hand, used his remaining hand to curve his fingers around the back of Ms. Hanna's head, pulling her toward him.

76.     Terrified, Ms. Hanna performed oral sex on Mr. York, then quickly scrambled out of his office and out of the club. She was terrified, but she also felt she had no choice but to continue going to work, day after day, to earn a living.

77.     Mr. York assaulted Ms. Hanna nearly a dozen times, approximately ten or eleven times, after this first incident.

78.     On these occasions, as he had done before, Mr. York asked an employee to instruct Ms. Hanna to go to his office at the end of her shift. When she failed to go to his office, Mr. York cornered her in a

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

1   hallway and reminded her that the decision of whether she remained employed by SR was "up to [him]"

2   because he "[was] the manager."

3   79.      When Ms. Hanna succumbed to Mr. York's demands and went to his office, she often found

4   Mr. York sitting in his chair in his office, counting chips or money. As she entered his office, Mr. York

5   would lift his eyes and casually ask Ms. Hanna to "give me a blow job real quick" or say "let's do it quick

6   before anybody comes," or words to that effect.

7   80.      As she performed oral sex, Mr. York held Ms. Hanna's head in place, yelling orders that she

8   "lick every bit of it" and to "lick every drop," or words to that effect.

9

10  81.      One day, after he ejaculated, Mr. York complained that Ms. Hanna had allowed a drop of semen

11  to fall on his pants. Mr. York appeared nervous, yelling expletives toward Ms. Hanna, screaming words

12  to the effect that she "got cum on [his] pants."

13  82.      On another occasion, as he forced Ms. Hanna to perform oral sex, Mr. York heard someone

14  approaching his office. He scrambled away from Ms. Hanna, stated that "someone's coming," and told

15  her to "act like it's under control." He instructed Ms. Hanna to "sit back down" and stated words to the

16  effect that she should "pretend we're talking about something, that I'm asking you about the rooms."

17

18  83.      Although Ms. Hanna believes several employees, including other managers at SR, suspected Mr.

19  York was assaulting her behind closed doors, no one ever asked her. Instead, Ms. Hanna suffered in

20  silence, fearful for her livelihood.

21  84.      Mr. York continued to harass Ms. Hanna while she worked, even on the club floor and in the

22  VIP room. He often asked Ms. Hanna if he could go to her house, and when she said no, he would

23  become frustrated.

24

25  85.      Several times, he called Ms. Hanna on her phone. Instead, when she saw his calls come through,

26  Ms. Hanna would often turn off her phone or reject his calls.

27

28

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

86.     When she did not pick up, Mr. York approached her at work the following day and asked her why she had not picked up her phone, demanding that she "make sure you pick up your phone" and "don't play any games," accusing her of "flaking out."

87.     Mr. York demanded that Ms. Hanna give him her address, reminding her he was her supervisor and that if she did not listen, he "could fire [her]." Because she had no choice, Ms. Hanna gave Mr. York her address.

88.     One Sunday in approximately the summer of 2012, Mr. York approached Ms. Hanna in the workplace and asked whether he could come to her home that day around 1:00 or 2:00 pm. Ms. Hanna did not respond to his request and left work that morning around 11:00 or 12:00 pm. She drove home, where she changed into sweat pants and a sweatshirt.

89.     At approximately 2:00 pm, she was relaxing and preparing to sleep after her shift when, suddenly, the front desk staff of her building called and notified her that Mr. York was downstairs.

90.     Ms. Hanna was surprised, as she had hoped Mr. York would not come, despite his threats to do so, and she felt scared that if she did not allow him upstairs, he would take away her VIP shifts or retaliate in some other way.

91.     The front desk let Mr. York into the elevator, which he took to the 21st floor where she lived, and knocked on the door. Ms. Hanna opened the door, and Mr. York walked into her living room and sat down on her couch. He commented on her apartment and the view, and talked with Ms. Hanna for approximately 15 or 20 minutes.

92.     Suddenly, Mr. York stood from his seat, walked toward Ms. Hanna, grabbed her hand while she was sitting in a chair, and said "let's go into the bedroom," pulling her up.

93.     Ms. Hanna said 'no,' and asked why, and Mr. York said "just come on, let's get comfortable," or words to that effect.

94.     Mr. York pulled Ms. Hanna toward her room and when they arrived, suddenly forced her onto the bed.  Ms. Hanna tried to sit up, but Mr. York, who was much heavier than Ms. Hanna and approximately 8 inches taller, forcefully pushed her back down.

95.     Again, Ms. Hanna said no, asked him to stop, and tried to escape, but Mr. York pushed Ms. Hanna's shoulders and chest and pushed her onto her back.

96.     Ms. Hanna remembers feeling numb, almost frozen, and unable to escape what seemed inevitable. She remembers thinking that if she did not do what Mr. York wanted, he would make her life difficult and torment her. She needed her job, and because of Mr. York's previous threats that he could fire her, she remained still as Mr. York began to remove her clothing.

97.     Mr. York first pulled down her pants, leaving them wrapped around her ankles. He left Ms. Hanna's shirt on. He then took off his own pants and shirt, but left on his underwear, which Ms. Hanna recalls was dark blue. Ms. Hanna again said no, then stated "stop, what are you doing?" or words to that effect.

98.     In response, Mr. York said "come on" in a frustrated tone, took off his underwear, and laid down on top of her.

99.     When he lay on top of Ms. Hanna, Mr. York forced his penis into Ms. Hanna's vagina, holding both of her wrists while he did this. He then ejaculated on Ms. Hanna's stomach.

100.    Mr. York was not wearing a condom.

101.    The rape lasted several minutes.

102.    Mr. York then stood up, walked into the bathroom, leaving Ms. Hanna on the bed. Mr. York walked out after several minutes, put on his clothing, and walked out of Ms. Hanna's apartment, leaving Ms. Hanna alone and crying.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

### Harassment by Mark Allheims and Chase Swanson

103.     Although Mark Allheims, another manager at SR, did not typically work the same shifts as Ms. Hanna, he sometimes covered other managers' morning shifts or overlapped with Ms. Hanna for approximately an hour at the end of his shift as Ms. Hanna was beginning her shift.

104.     When he walked past Ms. Hanna, Mr. Allheims often slapped Ms. Hanna's buttocks. He also commented on her age, as outlined in more detail below.

105.     Similarly, Chase Swanson, another manager at SR, asked Ms. Hanna to show him her breasts and smacked her buttocks.

106.     On other occasions, Mr. Swanson approached Ms. Hanna, asked her to lift up her skirt, which was part of her SR uniform, and would say words to the effect of "let me see your coochie" and "let me see your pussy" while slapping her buttocks.

107.     Several times, Mr. Swanson actually lifted Ms. Hanna's skirt. He also asked Ms. Hanna to "see [her] tits" and to "feel them."

### Age Discrimination

108.     Defendants repeatedly denied Ms. Hanna opportunities because of her age.

109.     While younger cocktail servers were regularly assigned to work in the VIP room and received better shifts, such as from 9:00 pm until 4:00 am, Ms. Hanna worked at Spearmint Rhino for years and was never given the opportunity to work that shift, despite her repeated requests to do so and her excellent performance.

110.     Defendants did not allow Ms. Hanna to work in the VIP room as frequently as other servers, depriving her of the opportunity to earn higher tips from customers.

111.     Defendants also denied Ms. Hanna the ability to work an earlier shift, when the club was busier and she had the ability to earn more money.

112.    One morning, as Ms. Hanna began to work her scheduled shift in the VIP room, a cocktail supervisor named D'acqua approached her and asked her to exit the VIP room, notifying Ms. Hanna that K-KEL, SR's co-owner, had asked that Ms. Hanna be removed from working in the VIP room because he wanted "younger girls" in that room. Indeed, Defendant replaced Ms. Hanna in the VIP room with a cocktail server that was in her early 20's.

113.    Ms. Hanna's supervisor Mark Allheims also referred to her as an "old lady," an "old hag," and a "grandma" and regularly made fun of her, stating that she was "grandfathered in" to working at the club, a reference to her age.

114.    Mr. Allheims regularly made these comments about Ms. Hanna in front of other employees, and several bartenders also made comments to Ms. Hanna regarding her age.

115.    Mr. Allheims also told Ms. Hanna that she needed "to retire" and asked her why she was "still here."

116.    On another occasion, a customer approached Ms. Hanna and introduced himself as an old friend of Mark Allheims's and stated he was visiting from out of town. He initially sat in Ms. Hanna's section of the restaurant where she served tables, and began to get to know her. Later that same evening, after speaking with Mr. Allheims, the customer approached Ms. Hanna and asked her how old she was, because Mr. Allheims had said she was "an old lady."

**CAUSES OF ACTION**

**COUNT 1**
(against K-Kel, Inc.)

**Discrimination Based on Sex in Violation of
NRS § 613.330 *et seq.* and 42 U.S.C. § 2000e *et seq.*
(Sexual Harassment)**

117.    Ms. Hanna repeats and re-alleges each and every allegation of the proceeding paragraphs of this complaint as though fully set forth herein and incorporates the same by reference.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

118.    Ms. Hanna is a member of the class of persons protected by state and federal statutes prohibiting discrimination based on sex, and sexual harassment is a form of illegal sex discrimination.

119.    Ms. Hanna was qualified for her position at Spearmint Rhino, and performed her job tasks competently during the course of her employment with Spearmint Rhino.

120.    Defendant K-Kel, Inc. qualifies as an employers subject to all Nevada and federal statutes prohibiting discrimination, NRS § 613.330 *et seq.* and Title VII, 42 U.S.C. § 2000e *et seq.* as amended, and thus, Defendants have a legal obligation to provide Ms. Hanna and all employees a workplace free of unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

121.    Defendants subjected Ms. Hanna to offensive verbal and physical conduct based on her sex, female.

122.    Ms. Hanna did not welcome the objectively offensive verbal and physical conduct of Messrs. Broadhurst, York, Allheims, or Swanson. Indeed, Ms. Hanna felt helpless to stop it without suffering adverse consequences in her workplace. For example, when Ms. Hanna walked away from Mr. York after he verbally sexually harassed her, Mr. York advised Ms. Hanna to "stop walking away from me, you know I could fire you," or words to that effect. Further, when Mr. York requested that Ms. Hanna come to his office and she attempted to leave the workplace, Mr. York found Ms. Hanna and threatened her that "if you don't do what I say, I can fire you," or words to that effect.

123.    Defendants' conduct toward Ms. Hanna was objectively abusive and unwelcome, as no reasonable woman could be expected to withstand such behavior.

124.    The objectively offensive, unwelcome verbal and physical conduct by Mssrs. Broadhurt, York, Allheims, and Swanson was sufficiently severe or pervasive to alter the terms and conditions of Ms. Hanna's employment. It also created an abusively hostile and illegal work environment. Defendant's conduct was frequent, occurring every day, many times. At times, Ms. Hanna was physically assaulted between ten and fifteen times by Mr. Broadhurst. This conduct was pervasive, as it occurred repeatedly

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

1    for several years, beginning on or about 2008 and ending in February 2016. The conduct was severe, and

2    culminated in Mr. York raping Ms. Hanna one Sunday during the summer of 2012.

3    125.    Defendants are strictly liable for the sexual harassment and assault to which its supervisors

4    subjected Ms. Hanna. Defendant explicitly conditioned Ms. Hanna's job on her acceding to the sexual

5    demands of Mr. York. As noted above, Mr. York threatened her would terminate Ms. Hanna's

6    employment if she walked away from him. On another occasion, when she declined to come to his

7    office, Mr. York again threatened to terminate her employment. Moreover, when Ms. Hanna failed to go

8    to Mr. York's office after he had previously sexually assaulted her, Mr. York cornered Ms. Hanna in the

9    hallway and reminded her that whether she remained employed by SR was "up to [him]" because he

10   "[was] the manager," or words to that effect.

11   126.    Defendants, as employers, are also not entitled to assert the affirmative defense that Ms. Hanna

12   unreasonably failed to use their complaint procedures (known as the *Burlington/Faragher* affirmative

13   defense). First, Defendants did not have any anti-discrimination or anti-harassment policies or

14   complaint procedures in place during the course of Ms. Hanna's employment. Defendants also did not

15   advise Ms. Hanna of any such policy at any time during her employment.

16   127.    Defendants failed to take reasonably adequate steps to prevent discrimination against Ms. Hanna

17   by failing to prevent years of sexual harassment by Mark Broadhurst, Mike York, Mark Allheims, and

18   Chase Swanson. Additionally, the nature of this predation also created a hostile work environment

19   which was compounded by the fact that Defendants' own supervisors engaged in, tolerated, and ratified

20   the conduct.

21   128.    Upon information and belief, Defendants failed to investigate previous complaints of sexual

22   harassment raised by other employees at Spearmint Rhino.

**KEMP & KEMP**
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

129.   Defendants specifically advised Ms. Hanna she could lose her job if she reported the assaults. Thus, Ms. Hanna was reasonable in her belief that going to human resources would be useless and possibly dangerous.

130.   Defendants have discriminated against Ms. Hanna through the actions of its supervisors, and knew or should have known of the conduct of Mssrs. Broadhurst, York, Allheims, and Swanson, but failed to prevent it, and failed altogether to investigate the inappropriate workplace conduct, which was at times open and obvious. As a result, Defendants are deemed to have ratified the conduct, which created an illegal and hostile work environment for Ms. Hanna for many years. This also constitutes a pattern and practice of illegal sex discrimination by Defendants over many years.

131.   As a result of Defendants' actions, Ms. Hanna is entitled to an award of punitive damages under Title VII in an amount sufficient to punish Defendant and to deter it and all other employers from engaging in this discriminatory conduct.

132.   Defendants' actions and omissions caused Ms. Hanna severe harm, injury, distress, and damage, including past and future pecuniary losses (pay and benefits), and emotional distress damages, and Ms. Hanna is entitled to recover all damages allowable in an amount subject to proof at trial.

133.   Ms. Hanna has had to engage the services of attorneys to redress and pursue the aforementioned illegal actions, and she is therefore entitled to recover all of her reasonable attorneys' fees and costs as allowed by 42 U.S.C. § 2000e5(k).

### COUNT 2
(against K-Kel, Inc.)

### Harassment and Discrimination Based on Age in Violation of
### NRS § 613.330 *et seq.* and The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*

134.   Ms. Hanna repeats and re-alleges each and every pertinent allegation of the proceeding paragraphs of this complaint as though fully set forth herein and incorporates the same by reference.

135.    Defendants subjected Ms. Hanna to harassment and discrimination in violation of both NRS §

613.330 *et seq.* and the ADEA, which prohibit age discrimination.

136.    Ms. Hanna was born in 1967. At all times relevant to this complaint, she was more than 40 years

of age.

137.    Ms. Hanna was qualified for her position as cocktail server, as she served in the position for

nearly a decade and performed her job satisfactorily.

138.    Ms. Hanna experienced an adverse employment action when Defendant declined to assign her

to work in the VIP rooms as frequently as younger cocktail servers, thereby depriving Ms. Hanna of the

ability to earn higher tips from customers in the VIP rooms. Ms. Hanna also experienced an adverse

employment action when Defendant denied her the opportunity to work the night shift, between 9:00

pm and 4:00 am, during which there were more customers and Ms. Hanna could earn more money.

139.    Defendants also harassed Ms. Hanna because of her age. For example, Mr. Allheims referred to

Ms. Hanna as an "old lady," an "old hag," and a "grandma". He also stated that she was "grandfathered

in" to working at the club, a reference to her age. Mr. Allheims also told Ms. Hanna that she needed "to

retire" and asked her why she was "still here."

140.    Defendants treated younger cocktail servers more favorably than Ms. Hanna. For example, on

one occasion, K-KEL, SR's co-owner, asked a supervisor to remove Ms. Hanna from working in the

VIP room because he wanted younger cocktail servers to work in that room. Indeed, Defendants

replaced Ms. Hanna in the VIP room with a cocktail server that was in her early 20's. Defendants also

regularly scheduled younger cocktail servers to work the 9:00 pm to 4:00 am shift and assigned them to

work in the VIP rooms, both of which were more profitable.

141.    Upon information and belief, Defendants knew the law prohibited their disparate treatment and

harassment of Ms. Hanna because of her age.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

142.     As a direct and proximate result of the Defendants' violation of NRS § 613.330 *et seq.* and the ADEA, Plaintiff suffered, among other things, lost wages, lost interest on earnings, investment opportunities, and other benefits; future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiff is entitled to all remedies available under the ADEA and NRS § 613.330 *et seq.* including punitive damages pursuant to NRS 613.432.

## **COUNT 3**
(against all Defendants)

CAUSE OF ACTION FOR DAMAGES RESULTING FROM CRIMINAL VIOLATION IN VIOLATION OF NRS 41.690

143.     Ms. Hanna repeats and re-alleges each and every pertinent allegation of the proceeding paragraphs of this complaint as though fully set forth herein and incorporates the same by reference.

144.     Defendants subjected Ms. Hanna to injuries as a proximate result of willful violations of NRS 200.366 Sexual Assault, NRS 200.400 Battery with Intent to Commit Sexual Assault, NRS 200.481 Battery, NRS 200.460 False Imprisonment, NRS 200.571(1)(a)(4) and (1)(b) Harassment, NRS 200.575 Stalking, and/or NRS 200.310 et seq. Kidnapping.

145.     Pursuant to NRS 193.0148, Ms. Hanna is a female and identifies and expresses her gender and identifies as a female.

146.     Defendant subjected Ms. Hanna to sexual assault and harassment.

147.     Defendants were motivated by Ms. Hanna's gender identity in taking these assaults.

148.     In fact, Ms. Hanna understands Defendants did not sexually abuse employees who identified or expressed their gender as male. She contends if she had identified as male or expressed a masculine gender identity, Defendants would not have sexually assaulted or harassed her.

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

149.    Defendants' actions and omissions caused Ms. Hanna severe harm, injury, distress, and damage, including past and future pecuniary losses (pay and benefits), and emotional distress damages, and Defendant should be ordered to compensate Ms. Hanna for the pecuniary and non-pecuniary compensatory damages she incurred, in addition to punitive damages for its willful and unlawful actions.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Hanna expressly reserves the right to amend her Complaint at or before the time of trial of the action herein to include all items of damages not yet ascertained, and demands judgment against the Defendants, upon each of them, as follows:

1.  A trial by jury;

2.  Declaratory judgment and associated relief as this Court may deem just and proper;

3.  Economic damages in excess of $15,000.00, including but not limited to back pay, lost wages and income, front pay, and benefits of employment;

4.  Compensatory damages for, *inter alia,* future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to career prospects, and others;

5.  Nominal damages if appropriate;

6.  Punitive and/or exemplary damages to deter the Defendant from future malicious, fraudulent, or oppressive conduct of a similar nature;

7.  Liquidated damages under the Age Discrimination in Employment Act, 29 U.S.C. § 626(b);

8.  Pre- and post-judgment interest on the amounts awarded at the prevailing legal rate;

9.  For an additional amount to account for any taxes Plaintiff may be called upon to pay in relation to any award made herein;

KEMP & KEMP
ATTORNEYS AT LAW
7435 W. Azure Drive, Suite 110
LAS VEGAS, NEVADA 89130
Tel. (702) 258-1183 • Fax (702) 258-6983

10. Reasonable attorneys fees, reasonable expert witness fees, and other costs of this action pursuant to federal and state statute, agreement, or court rule, and as authorized by § 706(k) of Title VII, 42 U.S.C. § 2000e-6(k); Nev. Rev. Stat. Ann. § 613.432; and the ADEA, 29 U.S.C. § 621-634, *et seq.*; and

11. For such other and further relief as this Court may deem just and proper.

DATED September 1, 2021

/s/ James P. Kemp
JAMES P. KEMP, ESQ.
Nevada Bar No.: 6375
KEMP & KEMP
7435 W. Azure Drive, Ste 110
Las Vegas, NV  89130
702-258-1183 ph./702-258-6983 fax

*Attorneys for Plaintiff*